IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2017 Session

## IN RE SAVANNA C.

**Appeal from the Circuit Court for Hamilton County**
**No. 15A222    W. Neil Thomas, III, Judge**

_____

**No. E2016-01703-COA-R3-PT**

_____

This is a termination of parental rights case involving the parental rights of the father, Jason C. ("Father"), to his minor child, Savanna C. ("the Child"), who was two years of age at the time of trial. The Child was born in 2014 to Father and Katie N. ("Mother"). On November 10, 2014, the Hamilton County Juvenile Court ("juvenile court") granted temporary legal custody of the Child to the maternal grandmother, Kathryn N. ("Maternal Grandmother"). The maternal grandfather, Tommy N. ("Maternal Grandfather"), was later added as a joint petitioner. The juvenile court adjudicated the Child dependent and neglected on August 20, 2015, and ordered that the Child remain in the custody of the Maternal Grandmother and Maternal Grandfather (collectively, "Maternal Grandparents"). On September 21, 2015, Maternal Grandparents filed a petition to terminate Father's parental rights to the Child in the Hamilton County Circuit Court ("trial court"). Following a bench trial, the trial court terminated Father's parental rights to the Child upon determining by clear and convincing evidence that Father had abandoned the Child by willfully failing to visit during the four months preceding the filing of the termination petition. The court also found clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. Father has appealed.[1] Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

_____

[1] The trial court also terminated Mother's parental rights to the Child. Mother and Father each respectively appealed the trial court's judgment, but Mother voluntarily dismissed her appeal in this matter. We will therefore confine our analysis to those facts relevant to Father.

David Paul Coates, Chattanooga, Tennessee, for the appellant, Jason C.

Kathy Rowell, Chattanooga, Tennessee, for the appellees, Tommy N. and Kathryn N.

Charles W. Wheland, III, Chattanooga, Tennessee, Guardian Ad Litem.

**OPINION**

I. Factual and Procedural Background

Upon petition filed by Maternal Grandmother, the juvenile court, in an order entered November 10, 2014, removed the Child from the custody of her parents due to the parents' lack of stable housing and drug addiction, placing temporary custody of the Child with Maternal Grandmother. Maternal Grandfather was not included in the initial custody order, but the juvenile court later added him as a joint petitioner. During a hearing in December 2014, Father submitted to a drug screen administered by the juvenile court and tested positive for oxycodone. Father reported having a prescription for the medication at that time.

Following removal of the Child from the parents' custody, Father filed a petition for custody in the juvenile court in March 2015, alleging that Mother had an extensive history of drug abuse and was not fit to care for the Child. Father also alleged that Maternal Grandparents had allowed Mother more visits per week than ordered by the juvenile court and had cancelled Father's visits abruptly. Father subsequently withdrew his custody petition, explaining during trial that he had filed the petition when he and Mother "had a break" in their relationship for approximately a week. Father later submitted to a hair follicle drug screen on or about April 10, 2015, with the results indicating that he tested positive for methamphetamine.

During the pendency of the juvenile case, as the juvenile court record reflects, Father was arrested for public intoxication in March 2015 and for "Driving Under the Influence of an Intoxicant" on May 16, 2015. Following the adjudicatory hearing on July 16, 2015, the juvenile court found by clear and convincing evidence that the Child was dependent and neglected as to Father and Mother due to the parents' lack of stability and progress. The court ordered that custody of the Child remain with Maternal Grandparents.

On September 21, 2015, Maternal Grandparents filed a petition in the trial court, seeking to terminate the parents' parental rights and adopt the Child. In their petition, Maternal Grandparents alleged as statutory grounds that the parents had abandoned the Child by failing to visit and support her in the four months preceding the petition's filing and that the conditions leading to the removal of the Child from the parents' home persisted. Maternal Grandparents also alleged that termination of the parents' parental

- 2 -

rights was in the best interest of the Child. The trial court conducted a bench trial on April 6, 2016.

During trial, Maternal Grandmother testified at the time she obtained emergency custody of the Child on November 10, 2014, the parents had left the Child with the paternal grandmother ("Paternal Grandmother") and Father's sister, and the Child had missed her nine-month medical check-up. Maternal Grandmother reported that the Child had contracted two ear infections requiring antibiotics within a span of a few weeks. According to Maternal Grandmother, the parents were not present when she picked up the Child from Paternal Grandmother's home. Maternal Grandmother obtained emergency custody from the juvenile court on the day she picked up the Child.

The juvenile court ordered supervised visits for the parents in early December, which were scheduled to occur twice per week. According to Maternal Grandmother, she allowed the parents to have regular visits prior to that court order. The visits between the parents and the Child took place at public places rather than Maternal Grandparents' home because, as Maternal Grandmother related, Father entered their home while Maternal Grandparents were away and stole blank checks, which he attempted to use. Subsequently, Maternal Grandparents did not allow Father in their home.

Concerning visitation, Maternal Grandmother kept a chart of the visits that occurred from November 2014 to April 2015. Maternal Grandmother's chart, introduced as a trial exhibit, reflects that there were thirteen visits offered to Father in November and December 2014. Of those thirteen visits, Father failed to appear for six and was late to five others. Maternal Grandmother's chart also reflects that twenty-five visits were offered to Father from January to April 2015. Of those twenty-five visits, Father failed to appear for nine and was late to thirteen others. According to Maternal Grandmother, when Father was late, he was approximately fifteen to thirty minutes late if not later. Maternal Grandmother reported that each visit lasted from one and one-half hours to two hours.

Although Maternal Grandparents were initially responsible for supervising the visits, in April 2015, the trial court ordered that all supervised visits between the parents and the Child would occur at Path Finders, a private agency providing supervision for visits. This change was by reason of tension between the parents and Maternal Grandparents. Maternal Grandmother reported that the parents' visits were moved to Path Finders because Father was harassing Maternal Grandparents. According to Maternal Grandmother, the parents were more concerned with the relationship between Mother and Father than the welfare of the Child. Maternal Grandmother explained that once the visits were changed to Path Finders, Father did not visit the Child again until January 2016.

On one occasion, Mother contacted Maternal Grandmother in the summer of 2015, requesting contact information for Path Finders so that the parents could schedule a visit. It is undisputed that Maternal Grandmother provided Mother with the requested information. However, the visit never took place. Maternal Grandmother indicated that she did not assist the parents with the $45 visitation fee because she believed it to be the parents' responsibility. According to Maternal Grandmother, she and Maternal Grandfather had paid for the Child's birth expenses and had offered to pay for Mother's individual counseling or rehabilitation. Maternal Grandmother testified that the parents had agreed to pay $101 a month toward the birth expenses but never paid anything.

Concerning financial support, Maternal Grandmother further testified that the parents never offered to provide any money to Grandparents for the Child's care, although the parents did provide gifts, including toys, a book, clothes, and marking pens. Maternal Grandmother explained that she had never rejected any gifts that the parents gave her for the Child. When asked why Maternal Grandparents filed the petition in this matter, Maternal Grandmother responded:

> Because [the parents] showed no interest in [the Child]. There were no visits. There was no contact from April till September. There was not one e-mail. There was not one text. There was not one phone call to ask about how is [the Child] doing. They know nothing about any medical. They never ask about doctor visits. They know nothing about their daughter. And we want to provide her with the same stable home where she has structure, that she was loved, and that she doesn't have to worry where is she going to live this time.

With reference to the Child's current home environment, Maternal Grandmother testified that she loved the Child and believed that she and her husband could provide an appropriate home for the Child. Maternal Grandmother reported that the Child was thriving in their home. Maternal Grandfather added that he also loved the Child and wished to adopt her.

During the course of trial, Maternal Grandparents presented evidence of Father's prior criminal conduct. Mirza Muretcehajic, a law enforcement officer, testified that he responded to a call at the parents' home on March 4, 2015, at which time Mother was "not in the right state of mind." Father informed Officer Muretcehajic that they were former users of methamphetamine and that Mother had locked herself in the bathroom. Officer Muretcehajic testified that Mother "wasn't making much sense" but that she had reported to him that she had not slept for three days and was not feeling well. According to Officer Muretcehajic, he observed drug paraphernalia in the bedroom of the home, including a pipe and residue. He did not remember observing a child in the home.

- 4 -

Officer Jeff Buckner with the Chattanooga Police Department testified regarding Father's arrest on May 16, 2015. Officer Buckner reported that police officers initially responded to the scene following reports that an individual was unresponsive at a gas station. According to Officer Buckner, Mother was responsive upon his arrival to the scene. Observing that Father appeared to be under the influence at the time, Officer Buckner conducted a field sobriety test. Officer Buckner arrested Father for driving under the influence, violation of implied consent, and possession of a drug for resale. Mother was also arrested for public intoxication.

Father testified that he was subsequently arrested for public intoxication on March 26, 2016. Father, however, denied being intoxicated at the time of the March 2016 arrest. Father claimed that he had driven back to Tennessee from Atlanta and had pulled his vehicle over at a Dollar General store "to take a nap." Father otherwise exercised his Fifth Amendment right to remain silent, declining to answer further questions about the incident.

Father also testified regarding his residential circumstances, stating that from November 2014 to January 2015, the parents lived with Paternal Grandmother. In January 2015, the parents moved to a home with friends and entered into a month-to-month lease, paying $350 per month in rent. They resided there until August 2015, after which they lived in their van for approximately two or three weeks. In September 2015, the parents returned to Paternal Grandmother's house. According to Father, the parents paid $400-450 a month for rent, food, and utilities while sleeping on the living room couch in Paternal Grandmother's home. Father testified that he and Mother had relocated to a new townhouse three days prior to trial. According to Father, he and Mother currently resided in a townhouse with his niece, sleeping in the living area. Father explained that he and Mother were not parties to the townhouse lease.

With reference to his work history, Father testified that he was currently unemployed. According to Father, he possessed qualifications in the fields of information system security, web design, and network engineering, with experience specifically in "network operation control, Cisco routing, server configuration, different things of that nature." Regarding his previous employment, Father testified that he had been employed by the Go2IT Group as an IBM consultant from April to August 2015. He indicated that although he was earning $17 or $18 per hour while working approximately eight or nine hours a day for three or four days per week, he would have periods of two or three weeks with no work during this time. Father testified that he was able to pay the parents' rent out of one paycheck from Go2IT. Father further stated that he was employed by Staffing Solutions, working at Amazon, from November 2, 2015, until January 3, 2016, earning $12 per hour. He left his employment at Amazon due to an injury but had been released to return to work. Subsequently, Father had been employed by Blue Marketing, assisting with web design, until February 27 or 28, 2016.

Father explained that he did not visit the Child between April 10, 2015, and late December 2015 due to the $45 visitation fee at Path Finders. Although Father claimed he visited with the Child in December 2015, he admitted that he had no proof that he had visited the Child between April 10, 2015, and January 2016. According to Father, he did not visit because he and Mother were "unemployed off and on" and trying to "get settled in a place and get on [their] feet." Father began visiting the Child in January 2016 and visited at least five times between January and February 2016. However, he did not begin visiting the Child immediately upon receiving income from Amazon because he was "catching up on bills," including paying some credit card bills, student loans payments, and money owed to immediate family members.

Father related that he possessed prescriptions for Adderall and Xanax for attention deficit hyperactivity disorder ("ADHD") and generalized anxiety. According to Father, he spends $47 to $56 per month on those prescriptions. Father explained that he was unable to function normally or hold a job without the medication. Father also testified that he had previously taken pain medication for his back condition when he could afford it but that he was not currently under the care of a physician for pain management. Father maintained that he had completed a drug assessment and mental health assessment but had not completed drug treatment because he was waiting on the results of the drug assessment. Father did not present copies of the assessments to the trial court.

Acknowledging that he had been ordered by the court to pay $328 per month in child support, Father admitted that he had not paid any support for the Child. Father insisted that he had offered the Maternal Grandparents financial support for care of the Child but that they had refused the money. Father related that although he and Mother attended a concert in October 2015, he did not pay for the tickets because they were provided to him as a birthday present.

It is undisputed that Mother and Father remained in a relationship at the time of trial. Mother reported that she and Father had moved out of Paternal Grandmother's home three days prior to the termination trial. Mother confirmed that the parents' names did not appear on the lease for their new residence. According to Mother, the parents planned to reside with Father's niece for six to eight weeks until they acquired their own apartment. Concerning drug use, Mother reported that she had smoked marijuana with Father previously but denied that they would "shoot up together."

According to Mother, she had secured two jobs three weeks prior to trial. Mother admitted that there was no reason she could not have worked before except that she had a "very bad addiction." Mother also testified that she was previously employed through a staffing agency from November 2015 through February 2016. Despite the parents' reported attempt to locate the phone number for Path Finders after receiving Mother's first paycheck from the staffing agency, she later e-mailed Maternal Grandmother, who provided her with contact information for Path Finders. According to Mother, the

parents' attempts to schedule a visit continued, but scheduling was delayed for weeks because of the holidays.

Following trial, the court took the matter under advisement. On April 29, 2016, the trial court entered its Memorandum and Order, dismissing Maternal Grandparents' termination petition upon finding that Maternal Grandparents had not proven a ground for termination of parental rights by clear and convincing evidence. Maternal Grandparents filed a motion to alter or amend the trial court's judgment, requesting that the trial court reconsider its dismissal of the termination petition.

Following a hearing, the trial court issued a Memorandum and Order on July 8, 2016, granting Maternal Grandparents' motion to alter or amend upon acknowledging that the court "incorrectly rel[ied] upon evidence . . . subsequent to the four month period to justify the conclusion that [Mother and Father] made attempts to see their daughter and had not, therefore, abandoned their daughter." The trial court recognized that the January and February 2016 visits were outside of the relevant four-month time period. Ultimately, the trial court found clear and convincing evidence to support the ground of abandonment for willful failure to visit as to Father and Mother.[2] The trial court also determined by clear and convincing evidence that termination of Father's and Mother's parental rights was in the best interest of the Child.[3]

Following the termination of his parental rights, Father timely appealed. On November 2, 2016, Mother requested that this Court "dismiss her appeal and remove her from the case as an appellant." This Court entered an order on November 7, 2016, dismissing Mother's appeal.

## II. Issues Presented

Father presents two issues for our review, which we have restated slightly as follows:

---

[2] Although Grandparents pled the ground of abandonment for failure to support the Child in their petition, the court did not address that ground in its order terminating Father's parental rights.

[3] Upon reviewing the record, this Court had found no final order disposing of all matters before the trial court. Specifically, the trial court's judgment did not address the issue of adoption, which had been pled in Grandparents' petition, and the judgment was not certified as a final order pursuant to Tennessee Rule of Civil Procedure 54.02. On June 5, 2017, this Court entered an order directing the parties to obtain a final judgment in this matter or show cause why their appeal should not be dismissed. The trial court entered an order on June 20, 2017, certifying its judgment as final pursuant to Tennessee Rule of Civil Procedure 54.02, which was filed with this Court as a supplemental record. Father's initial notice of appeal was treated as prematurely filed and, therefore, timely. However, Father failed to sign his initial notice of appeal as required by Tennessee Code Annotated § 36-1-124(d). Father timely filed an amended notice of appeal containing his signature within thirty days of the final judgment on July 20, 2017. Therefore, we will proceed in addressing the merits of this appeal.

1.      Whether the trial court erred by finding clear and convincing evidence that Father abandoned the Child by willfully failing to visit her for four months preceding the filing of the termination petition.

2.      Whether the trial court properly exercised subject matter jurisdiction over the statutory ground of termination for persistence of the conditions that led to the Child's removal from Father's home.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27

(1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Abandonment by Willful Failure to Visit

Father asserts that the trial court erred by terminating his parental rights based on the ground of abandonment by willful failure to visit. Father does not dispute that he failed to visit the child during the relevant statutory time period but instead argues that his failure to visit the Child was not willful. Upon a thorough review of the record, we disagree. We conclude that the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence. Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part:

- 9 -

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4. All pleadings and records filed in the chancery and circuit courts pursuant to this section shall be placed under seal and shall not be subject to public disclosure, in the same manner as those filed in juvenile court, unless otherwise provided by court order.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

    (1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
    (2)     That termination of the parent's or guardian's rights is in the best interests of the child.

Tennessee Code Annotated § 36-1-113(g)(1) authorizes termination of parental rights when:

Abandonment by the parent or guardian, as defined in section 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (Supp. 2016) defines abandonment, in relevant part, as:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court previously has explained:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. section 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. This Court has further explained:

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* Furthermore, "[a] parent cannot be said to have abandoned a child when his failure to visit . . . is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A parent's failure to visit is not excused by someone else's conduct unless the conduct actually prevents the obligated person from visiting or "amounts to a significant restraint of or interference with the parent's efforts to develop a relationship with a child." *Id.* at 863-64. Lastly, any efforts made to visit a child after a petition to terminate parental rights has been filed do not negate or provide repentance for prior abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(F); *In re S.R.M.*, E2008-01359-COA-R3-PT, 2009 WL 837715, at *12 (Tenn. Ct. App. Mar. 27, 2009).

In the present case, the trial court found in its April 29, 2016 Memorandum and Order regarding the ground of abandonment by willfully failing to visit the Child:

The history of this lawsuit starts in Juvenile Court on a petition for dependency and neglect filed by [Maternal Grandparents] herein. On July 16, 2015, the Juvenile Court found [the Child] to be dependent and neglected and awarded custody to [Maternal Grandparents]. That Order also provided for supervised visitation by [the Child's] parents through Path Finders. By Findings and Recommendations dated April 10, 2015, Juvenile Court had previously found that temporary custody of [the Child] was to remain with [Maternal Grandparents] with supervised parental visitation through Path Finders.

- 11 -

Between April 10, 2015 and the filing date in this action of September 21, 2015, there were no visits by the parents with their daughter. This record is replete with alcohol and prescription medication abuse by both parents, but both have sought counseling and have tried to overcome their situation.[FN] With respect to the lack of visitation with [the Child], the parents explained that they were without funds to pay for the supervision required by the Court's Order. There is support for this explanation in the record, although it is equivocal since there have been times when some funds have been available to pay for the supervision. The Court cannot say, however, that they have not tried. In addition, even though there was no visitation in the four month period of time prior to the filing of this action, the parents have made efforts and have visited with [the Child] since the filing date, which under In re D'Vante P., [No. E2013-02148-COA-R3-PT, 2014 WL 1835345 (Tenn. Ct. App. 2014),] the Court can consider. As indicated above, one reason given by the parents for their failure to visit during the four months prior to filing is that the parents lacked the funds to make the payments necessary for supervision. The parents testified that they were basically out of work, but they also testified that during this same period they had a significant drug problem for which some funds must have been available. After they gained employment, they did visit with their daughter five times between January and February, 2016. Although there was testimony that they were given free tickets in October, 2015 to a concert in Murfreesboro which they could have redeemed, that, by itself, is insufficient to establish the means for regular visitation with [the Child].

* * *

Although the parents have not visited with [the Child] during the four months period prior to the filing, and although the conditions under which they lived during that period of time and after may be best described as deplorable, the Court does not believe that clear and convincing evidence has been submitted to warrant termination of their parental rights. The Court would point out that there is a difference between the standards for determining primary residential parent and those for termination of parental rights. While the evidence here would never qualify these parents to be primary residential parents at this point in time, that same evidence does not justify termination of their rights as parents. Accordingly, the petition for termination will be dismissed.

[FN] The Court makes this finding even though the father invoked the Fifth Amendment with respect to his criminal record.

- 12 -

Based on the foregoing facts, the trial court initially determined that Maternal Grandparents failed to prove by clear and convincing evidence that Father had abandoned the Child by willfully failing to visit.

However, Maternal Grandparents timely filed a motion to alter or amend the trial court's April 29, 2016 Memorandum and Order arguing that the trial court utilized an improper standard regarding abandonment and that the court incorrectly relied upon the parents' visits with the Child subsequent to the termination petition's filing. Upon consideration of this motion, the trial court entered its July 8, 2016 Memorandum and Order, in which the trial court found as follows:

> [T]he Court wants to make it clear that it did rely solely upon the four month standard set forth in the above-mentioned statute [Tennessee Code Annotated § 36-1-102(1)(A)(i)]. The Court did, however, incorrectly rely upon evidence which was submitted by [Maternal Grandparents] subsequent to the four month period to justify the conclusion that [the parents] made attempts to see their daughter and had not, therefore, abandoned their daughter. It is noteworthy that more attempts occurred after the filing of the petition herein in September, 2015, and after the Order in January, 2016, which set this case for hearing. During the relevant four month period, which in this case is actually a span of eight months from April, 2015 to January, 2016, the parents had the ability to visit their daughter and chose not to, spending money during that time on items for which visitation expenditures should have been used. The mother also testified during the relevant time period that she was unable to work because of a drug addiction problem, but such an addiction is not a justifiable excuse for a failure to visit. . . . In finding that [the parents'] rights should not be terminated, this Court relied upon evidence that they did visit in January and February, 2016, outside the four month period.
>
> If this evidence is excluded, the remainder of the evidence recited in this Court's prior Memorandum does constitute clear and convincing evidence of abandonment within the meaning of the statute. The authority which was cited by the Court for the consideration of that evidence, In re D'Vante, 2014 WL 1835345 (Tenn. App. 2014), applies in a persistence case and is, therefore, inapplicable in a case under T.C.A. § 36-1-102(1)(A)(i). Without that evidence, there is a clear and convincing evidence of abandonment.
>
> To reiterate, that evidence included the following: neither parent visited with their daughter between April, 2015, and January, 2016. Their sole justification for their failure was lack of funds. The Court finds, however, that they were capable of working and that the funds they did

- 13 -

> obtain were used for drugs, alcohol and entertainment. There is no
> evidence to support their position because there is none.

(Emphasis in original.) Based on the above facts, the trial court therefore found by clear and convincing evidence that Father had willfully failed to visit the Child during the determinative four-month period immediately preceding the filing of the termination petition.

It is important first to clarify the statutory determinative period at issue. In its order, the trial court found that the relevant four-month period extended from April 2015 to January 2016. Maternal Grandparents filed the termination petition on September 21, 2015. The correct four-month determinative period for purposes of determining abandonment, pursuant to Tennessee Code Annotated § 36-1-102(1)(A), began on May 21, 2015, and concluded on September 20, 2015, the day prior to the filing of the termination petition. *See In re Jacob C.H.,* No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). We note that inasmuch as the trial court's findings encompassed the correct determinative period, this correction does not affect the outcome of this action or the issues raised on appeal.

Father contends that Maternal Grandparents failed to present clear and convincing evidence that his failure to visit the Child during the relevant time period was willful. Father specifically argues that the trial court erred by (1) considering evidence regarding visitation outside the four-month determinative period, (2) failing to consider that he was "actively litigating" the juvenile court action during the determinative period, and (3) failing to consider that his visits were thwarted by Maternal Grandparents. We will address each argument in turn.

First, Father alleges that the trial court improperly considered his attendance at a concert in October 2015; arrest for driving under the influence on May 16, 2015; and arrest for public intoxication in March 2016 when determining that he willfully failed to visit the Child. According to Father, "[t]hat the trial court specifically mentioned alcohol and entertainment as part of its finding of grounds to prove abandonment shows that the trial court was relying on improper evidence in reaching its conclusion[.]" We disagree.

This Court has previously examined evidence prior to the relevant four-month time period when determining whether a parent's failure to visit was willful. *See In re Brookelyn W.,* No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *9 (Tenn. Ct. App. Mar. 24, 2015). As this Court explained:

> [I]n determining whether a parent's conduct was "willful," it may become
> necessary in a given case to evaluate events occurring prior to the start of

- 14 -

the four-month period. Thus, events occurring prior to the four-month period may bear on the "willfulness" of the parent's conduct during the four-month period. *See In re Alex B.T.,* No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) ("Courts often consider events that occurred prior to the relevant period to determine if there was interference with the biological parent's attempts to visit or support the child[.]"); *see also In re Keri C.,* No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at *16 (Tenn. Ct. App. Nov. 22, 2010) (explaining that the parent's conduct prior to the four-month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four-month period).

*Id.*

In the case at bar, it is undisputed that Father failed to visit the Child from April 2015 until at least December 2015; therefore, the trial court was required to determine whether Father's failure to visit during the four-month statutory period was willful. In making its decision, the trial court ultimately considered evidence that occurred both during and prior to the four-month statutory period. Despite Father's argument to the contrary, the trial court was permitted to consider evidence that occurred prior to the beginning of the statutory determinative period. *See id.* As to Father's argument regarding his March 2016 arrest, we discern no indication that the trial court relied on that arrest for its findings regarding Father's ability to procure alcohol and entertainment.

Second, relying on *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), Father asserts that conflict arose between the parties during the visits and that he was "actively litigating custody during that time." He accordingly argues that "[b]ecause [Father] was still trying to assert his rights in the juvenile court during the period from May 21, 2015 until at least August 20, 2015 and the entire period involved enmity between [Father] and [Maternal Grandparents], the aforementioned time period was not one in which the father willfully failed to visit." Upon careful review, we determine that Father was not actively pursuing custody or visitation with the Child.

*In re Adoption of A.M.H.* involved an incident when the parents became upset with the custodians of the child, and the custodians notified law enforcement officers, who instructed the parents to leave the custodians' home and not return or they would be arrested. *Id.* at 801. Following the event, the parents had no further visits with A.M.H. *Id.* Four months and five days after the incident at the custodians' home, the custodians filed a petition to terminate the parents' rights to A.M.H. *Id.* at 801-02. During those four months prior to the termination petition's filing, the parents were actively pursuing avenues to regain custody of their child. *Id.* at 802. They had contacted the juvenile court with inquiries about how to regain custody of the Child, and had contacted the local media. *Id.* During that time, the parents also had initiated two juvenile court hearings on

a petition to regain custody of A.M.H. *Id.* The custodians requested a continuance of the first hearing, and the second hearing was cancelled after the petitioners initiated adoption proceedings in chancery court, which would have removed jurisdiction from the juvenile court. *Id.* The Supreme Court recognized several undisputed facts, including that: "[t]he first hearing was thwarted by the [custodians'] request for a continuance" and "[t]he second hearing was thwarted by the [custodians'] initiation of proceedings in chancery court." *Id.* at 810. The Supreme Court held in *A.M.H.*: "Where . . . the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment." *Id.*

Ergo, in *A.M.H.*, it was clear that the parents were actively pursuing custody of the child and that their efforts were thwarted by the actions of the custodians. *Id.* We conclude that the present case is distinguishable from *In re Adoption of A.M.H.* and more closely related to the decision in *In re Adoption of Angela E.*, 402 S.W.3d at 642, wherein our Supreme Court determined that although a father had filed a petition to reinstate visitation, he had taken no further actions to pursue custody. In that case, the Supreme Court agreed with this Court's determination that it was "not a case in which a parent was actively trying to maintain visitation," thus determining *In re Adoption of A.M.H.* to be distinguishable. *See id.*

In the instant action, it is undisputed that conflict existed between Maternal Grandparents and Father, which resulted in Father's visits being supervised by Path Finders instead of Maternal Grandparents. In March 2015, Father filed a petition in juvenile court seeking custody of the Child. The juvenile court record reflects that on April 10, 2015, "[F]ather stated that he no longer wished to pursue his petition for custody," and the trial court dismissed his custody petition. Father's petition for custody was not pending during the statutory determinative period. Although Father was involved as a party to the juvenile court action filed by Maternal Grandparents during the determinative period, he was not actively seeking visitation or custody of the Child during that time. In fact, the juvenile court record reflects that Father was arrested during the pendency of the juvenile court case, failed a hair follicle drug screen when he tested positive for methamphetamine, and had not provided the juvenile court with proof of his completion of an alcohol and drug assessment or mental health assessment as ordered by the court. Also, the juvenile court determined the Child to be dependent and neglected in part due to Father's "lack of progress."[4] Upon reviewing the record, we determine that

---

[4] According to the juvenile court record, the following occurred during a hearing conducted on July 16, 2015:

> All parties were properly sworn. The mother and [Father], reported they were currently not employed. They both reside with the paternal grandmother. Hair follicles drug screens were submitted for mother and father and both were positive for methamphetamine. The father did not provide proof of completion of an alcohol and

Father does not appear to have made substantial efforts during the statutory determinative period such that he was "actively trying to maintain visitation" with the Child. *See In re Adoption of Angela E.*, 402 S.W.3d at 642.

Finally, Father contends that his failure to visit was not willful because he was "thwarted in his attempts to visit with his daughter by the actions of [Maternal Grandparents]." In his principal brief on appeal, Father asserts that Maternal Grandparents' request for Father's visitation to be supervised by Path Finders, a facility providing visitation supervision for a fee, "was mere pretext as [Maternal Grandparents] knew or should have known that the cost of visitation would place a high burden on [Father] that would render him unable to visit with his child." We determine Father's argument to be unavailing.

It is well settled in Tennessee that "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *See In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.") (internal citations and footnote omitted); *see, e.g., In re Taliah L.B.*, No. E2012-02102-COA-R3-PT, 2013 WL 1319573, at *9 (Tenn. Ct. App. Apr. 2, 2013) ("While Mother's ability to visit with the Child was 'restrained' in that Custodial Parents refused the request for continued *unsupervised* visitation, the limitation did not significantly interfere with Mother's ability to visit the Child during the requisite time period.") (emphasis in original). Moreover, as this Court has explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

---

drug assessment or a mental health assessment as previously ordered. . . . Since the last Court date, the parents were arrested on May 16, 2015. The mother was arrested for Public Intoxica[tion] and the father was arrested for Driving Under the Influence of an Intoxicant.

Due to the lack of the parents' stability and their lack of progress, the Court found by clear and convincing evidence that said child is dependent and neglected and that custody should remain with the maternal grandparents.

- 17 -

*In re Audrey S.*, 182 S.W.3d at 863-64 (internal citations omitted).

Tennessee courts have previously upheld the termination of a parent's parental rights based on abandonment for willful failure to visit when a parent was required to accomplish certain steps or requirements in order to reestablish visitation with a child and declined to do so. *See In re Adoption of Angela E.,* 402 S.W.3d at 642; *In re Elijah B.,* No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *8 (Tenn. Ct. App. Dec. 29, 2010) (determining that a parent's failure to visit was willful despite a prior order prohibiting contact between the parent and the child when the parent was informed that his visitation would be reinstated if he passed a drug screen). In the present case, the juvenile court ordered in April 2015 that Father's visits with the Child were to occur at Path Finders and that Father was responsible for the $45 per-visit cost. The juvenile court's order provided that Father could request an increase in his visitation with the Child if he accomplished certain requirements, including providing a clean hair follicle drug screen, providing proof of counseling, avoiding criminal charges, and obtaining stable housing and employment. Not only did the trial court find that Father failed to comply with the juvenile court's requirements for additional visitation, the record is devoid of any such request by Father for the juvenile court to increase his visitation or remove the stipulation that his visitation with the Child occur at Path Finders.

In prior decisions, this Court has determined that a parent's failure to visit can be willful even though the parent was required to pay a fee to visit his or her child at a private facility responsible for supervising the visits. *See, e.g., In re Kayla N.A.*, No. E2012-02662-COA-R3-PT, 2013 WL 5874763, at *7 (Tenn. Ct. App. Oct. 31, 2013); *In re Jarrel X.W.*, No. E2012-00380-COA-R3-PT, 2012 WL 6596157, at *9 (Tenn. Ct. App. Nov. 7, 2012). Father claims that he was unable to afford to pay the visitation fee at Path Finders in order to visit the Child. This Court addressed a similar issue in *In re Tiashaun C.,* No. E2012-01514-COA-R3-PT, 2013 WL 672563, at *3 (Tenn. Ct. App. Feb. 22, 2013), wherein a mother claimed her failure to visit was not willful due in part to her inability to pay the visitation fee. This Court explained:

> The trial court found that it was uncontroverted that Mother had not visited the Children for at least four months preceding the filing of the petition to terminate. The court further found that this failure was willful pursuant to Tenn. Code Ann. §§ 36-1-102 (2010) and 36-1-113 (2010). The court found that Mother's assertions regarding her inability to pay Parent Place's fee and her lack of transportation were not credible. The court found that Mother had admitted she could get a ride from friends or family or take the bus. The court also found that, based on Mother's testimony about her income, she should have had at least $20 to $90 per month left over after she paid child support. The court noted that the visits at Parent Place cost only $20 a week. The court found that Mother clearly could have visited the Children, but chose not to.

- 18 -

*In re Tiashaun C.*, 2013 WL 672563, at *3 (footnote omitted).

Unlike the trial court in *In re Tiashaun C.*, the trial court in this matter did not make specific credibility determinations. However, based on the trial court's resolution of certain conflicts in testimony, the court clearly did not find Father's testimony regarding this issue to be credible. *See In re Sidney J.*, 313 S.W.3d 772, 777 (Tenn. 2010) ("We may infer the trial court's findings on issues of credibility and weight of testimony from the manner in which the trial court resolved conflicts in the testimony and decided the case."). Although the trial court also did not make a specific finding regarding Father's disposable income, the court found that Father was capable of working during the determinative period and that he spent his money on other discretionary expenditures other than visiting the Child.

According to Father, if he had possessed the funds from April 2015 to January 2016, he would have paid to visit the Child. As previously noted, the determinative period began on May 21, 2015, and concluded on September 20, 2015. At trial, Father testified that he had been employed by the Go2IT Group as an IBM consultant from April through August 2015. According to Father, he was earning $17 or $18 per hour at Go2IT Group while working approximately eight or nine hours a day for three or four days per week. Although Father stated that he would sometimes be without work for two or three weeks at a time, he acknowledged that he was able to pay his $350 rent out of one paycheck from Go2IT. Therefore, despite Father's explanation that he did not visit the Child because he and Mother were "unemployed off and on" and trying to "get settled in a place and get on [their] feet," Father clearly possessed sufficient income from his employment at Go2IT that would have enabled him to pay the visitation fee during the majority of the determinative period.

This Court has previously affirmed the termination of a mother's parental rights when she expended her limited resources for "other things" instead of using her funds to visit her child. *See In re Tylon L.D.*, No. E2010-01744-COA-R3-PT, 2011 WL 1884634, at *5-7 (Tenn. Ct. App. Mar. 7, 2011). In *In re Tylon L.D.*, the mother argued that her failure to visit was not willful because she did not have reliable transportation to travel to the visits. *Id.* DCS had arranged transportation for the mother through the "ETHRA service" at a round trip cost of $18 per visit. *Id.* According to the mother, she was unable to "'afford the basics in life much less ETHRA transportation.'" *Id.* The mother's testimony established that, in addition to her drug addiction, she had assumed the cost of caring for a large dog during the same time period that she was experiencing transportation issues. *Id.* This Court determined that the evidence did not preponderate against the trial court's finding that the mother's failure to visit was willful and that she "chose to spend her limited financial resources on other things instead of utilizing the transportation made available to her" to visit her child. *Id.* This Court therefore affirmed

the trial court's termination of Mother's parental rights on the ground of abandonment. *Id.*

In the instant case, Father did not visit the Child from April 2015 through January 2016.[5] Father began visiting the Child in January 2016 and visited at least five times between January and February 2016. We note that abandonment by failing to visit the Child cannot be negated by any efforts the parents make to visit the Child after the termination petition was filed. *See* Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]") In its April 29, 2016 order, the trial court initially considered the parents' visits that occurred in January and February 2016 when determining that Maternal Grandparents' evidence did not rise to the level of clear and convincing. However, in its July 8, 2016 order, the trial court reconsidered the issue without relying on evidence of visits occurring after the termination petition's filing, finding that clear and convincing evidence did exist to establish that the parents abandoned the Child by willfully failing to visit her.

Although Father argues that he could not afford to visit the Child, the trial court found that "some funds" were available to the parents as evinced by their testimony regarding drug use. At trial, Father reported that he had not used any drugs for at least a year and a half prior to trial. Maternal Grandparents presented evidence seeking to establish that Father's drug use was ongoing. Mother and Father were in a romantic relationship during the entire pendency of this action, except for approximately one week in March 2015, at which time Father filed his petition for custody in juvenile court presenting allegations against Mother. Therefore, according to Father's testimony, Mother and Father were together during the entire determinative period. At trial, Mother testified that she was addicted to drugs during the determinative period, stating that she used methamphetamine from early 2015 until August 2015. Mother acknowledged that she had been "taking drugs for a long time and buying them illegally." According to Mother, she and Father "smoke[d] pot together" but did not "shoot up together."

Regarding the incident occurring at the parents' home on March 4, 2015, Officer Muretcehajic observed Mother to be "not in the right state of mind." According to Father, Mother had locked herself in the bathroom. The parents informed the officers that they were former "meth users." Officer Muretcehajic testified that the officers observed drug paraphernalia in the parents' bedroom, including a pipe and residue. He further explained that because their attention was on Mother's well-being, the officers' focus was not on the drug paraphernalia at the time. According to Officer Muretcehajic, "EMS" came to the home, treated Mother, and transported her to a hospital.

---

[5] Although Father claimed that he visited the Child in December 2015, Maternal Grandmother denied this claim, and the trial court found that no visits between Father and the Child occurred until January 2016.

Furthermore, the record reflects that Father was arrested for public intoxication on March 18, 2015, during the pendency of the juvenile court action. Subsequently, on May 16, 2015, Father was arrested and charged with driving under the influence, implied consent, and possession of a drug for resale. Officer Buckner testified that on May 16, 2015, Father was administered a field sobriety test and determined to be under the influence, with Father's charges still pending at the time of trial. Despite Father's denial of drug use, the trial court found that "[the parents'] lifestyle was one of vagrancy with intermittent use of drugs" and determined that "some funds must have been available" to them.

Although Maternal Grandparents presented evidence at trial that the parents attended a concert in October 2015, Father claimed that the tickets were given to him as a birthday gift. According to Father, the tickets' combined value was approximately $60 to $70. The trial court found that although the tickets "could have [been] redeemed, that, by itself, is insufficient to establish the means for regular visitation with [the Child]." However, in its order entered July 8, 2016, the trial court determined that Father was capable of working and that he spent his money on other things, including entertainment, drugs, and alcohol instead of visiting the Child.

Additionally, although Maternal Grandparents deny that Father had offered them any financial support for the Child's care, Father testified that he attempted to give Maternal Grandparents some funds but that they had refused. Father acknowledged that he had not provided Maternal Grandparents with any financial support for the Child. Assuming, *arguendo*, that Father's testimony is true in this regard, Father's assertion suggests that Father possessed some funds that could have been applied toward visits with the Child after Maternal Grandparents had rejected the money.

The trial court determined that "the parents had the ability to visit their daughter and chose not to, spending money during that time on items for which visitation expenditures should have been used." Upon a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father willfully failed to visit the Child during the four months preceding the filing of the termination petition.

## V. Persistence of Conditions

Father also argues that the trial court "lacked subject-matter jurisdiction and justiciability to decide the issue of persistence of conditions" "[b]ecause six months had not elapsed before pleading this ground" in Maternal Grandparents' petition. We note that the Hamilton County Circuit Court clearly had subject matter jurisdiction to hear all grounds regarding a termination action involving the Child. *See* Tenn. Code Ann. § 36-1-113(a) ("The chancery and circuit courts shall have concurrent jurisdiction with the

- 21 -

juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part . . . .").

After finding that clear and convincing evidence supported the ground of abandonment due to Father's willful failure to visit the Child, the trial court determined that a decision on the ground of persistence of conditions was unnecessary. We note that the better practice is for the trial court to address all grounds pled in the termination petition. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). As our Supreme Court has explained:

> The trial court is required to find only one statutory ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113 (2001). However, given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented. If the trial court addresses each ground that is raised in a termination proceeding, the child's permanent placement will not be unnecessarily delayed due to a remand for findings on alternate grounds.

*In re D.L.B.*, 118 S.W.3d at 367. Nonetheless, because no party has argued that persistence of conditions should or should not have been found, and because the trial court made no finding regarding the ground of persistence of conditions, this issue is not properly before this Court. *See Dorrier v. Dark,* 537 S.W.2d 888, 890 (Tenn. 1976) ("This is a court of appeals and errors, and we are limited in authority to the adjudication of issues that are presented and decided in the trial courts[.]").

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from

the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Although Father has not appealed the trial court's determination that it was in the Child's best interest to terminate Father's parental rights, we have considered the issue because of its importance. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010), overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). Following our thorough review of the evidence, we conclude that the record contains clear and convincing evidence to support the trial court's determination regarding the Child's best interest. We therefore affirm the trial court's termination of Father's parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Father's parental rights to the Child. Costs are assessed to the appellant, Jason C. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE